# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-0277V

|  |  |
|---|---|
| JOHN PIERMATTEO, | Chief Special Master Corcoran |
| Petitioner, | Filed: March 28, 2025 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Mallori Browne Openchowski, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On March 10, 2022, John Piermatteo filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered Guillain-Barré syndrome ("GBS") resulting from an influenza ("flu") vaccine received on December 11, 2019. Petition at 1. I determined Petitioner was entitled to compensation,[3] but the parties were unable to resolve damages, and instead briefed the matter (ECF Nos. 37, 38, 39). A "Motions Day"

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] On February 21, 2023, Respondent filed a Rule 4(c) Report opposing compensation (ECF No. 21). Thereafter, Petitioner filed additional evidence (ECF No. 23), and Respondent filed an amended Report conceding that Petitioner is entitled to compensation (ECF No. 26).

damages hearing was held on March 28, 2025, and this written decision memorializes my oral ruling issued at the conclusion of the hearing.[4]

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$170,000.00 for actual pain and suffering, in addition to $54,917.29[5] to satisfy a Medicaid lien.**

## I.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

---

[4] At the March 28th hearing, Richard Amada argued for Petitioner, and Mary Holmes argued for Respondent.

My oral ruling issued during the hearing will be set forth in the transcript from the hearing, which has not yet been filed but is fully incorporated into this Decision.

[5] During the March 28th hearing, there was discussion about whether the Medicaid lien amount required updating. Following the hearing, Petitioner's counsel and Respondent's counsel confirmed in informal email communications to each other and an OSM staff attorney that $54,917.29 is the correct amount for the lien.

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

## II.    Prior SPU Compensation of GBS Pain and Suffering[6]

### A.    Data Regarding Compensation in SPU Flu/ GBS Cases

Flu/GBS cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, since SPU's inception ten years ago, 897 GBS cases have been resolved. Compensation has been awarded in the vast majority of cases (852), with the remaining 45 cases dismissed.

The data for all categories of theses damages decisions reflect the expected differences in outcome, summarized as follows:

---

[6] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of GBS claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

| | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[7] Agreement |
|---|---|---|---|---|
| **Total Cases** | *56* | *412* | *20* | *364* |
| **Lowest** | $96,008.66 | $9,050.40 | $20,000.00 | $3,098.64 |
| **1st Quartile** | $156,760.64 | $125,000.00 | $128,700.00 | $100,000.00 |
| **Median** | **$171,082.15** | **$162,940.13** | **$224,397.27** | **$150,000.00** |
| **3rd Quartile** | $186,457.51 | $244,193.98 | $380,028.33 | $221,250.00 |
| **Largest** | $244,390.18 | $2,282,465.84 | $985,000.00 | $1,200,000.00 |

## B.    Adjudication Specifically of GBS Pain and Suffering

Only a small minority of cases have involved a special master's adjudication of damages issues. The written decisions setting forth such determinations provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[8]

As of January 1, 2025, in nearly every occasion that SPU has had to resolve the appropriate award for GBS pain and suffering, over $100,000.00 has been awarded (with a lower sum, lower sum, $92,500.00, only awarded once). The remaining fifty-five (55) awards far exceeded $100,000.00. The first-quartile value is $153,750.00. The median is $167,500.00. The third-quartile value is $178,500.00. The largest award was $197,500.00.

These decisions are informed by what is known about GBS, including its description as set forth in the Vaccine Injury Table ("Table"). Pursuant to the Table, vaccine causation is presumed for GBS with an onset 3 – 42 days (not less than 3 days, and not more than 42 days) after receipt of a seasonal flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(D). The Qualifications and Aids to Interpretation ("QAI") explain:

> GBS is an acute monophasic peripheral neuropathy that encompasses a spectrum of four clinicopathological subtypes… The interval between the first appearance of symptoms and the nadir of weakness is between 12

---

[7] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

[8] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

> hours and 28 days. This is followed in all subtypes by a clinical plateau with stabilization at the nadir of symptoms, or subsequent improvement without significant relapse. Death may occur without a clinical plateau. Treatment-related fluctuations in all subtypes of GBS can occur within 9 weeks of GBS symptom onset, and recurrence of symptoms after this timeframe would not be consistent with GBS.

42 C.F.R. § 100.3(c)(15)(I) (2017). The three most common subtypes are acute inflammatory demyelinating polyneuropathy ("AIDP"); acute motor axonal neuropathy ("AMAN"); and acute motor and sensory neuropathy ("AMSAN"). Id. The onset of each is marked by "bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs." Id. at (c)(15)(II). The fourth subtype – Fisher syndrome or Miller-Fisher syndrome – has a different onset of "bilateral ophthalmoparesis; bilateral reduced or absent tendon reflexes; [and] ataxia." *Id.* at (c)(15)(III).[9]

A consistent starting consideration is that "GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically alarming injury, such as SIRVA."[10] *Gross v. Sec'y of Health & Human Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. March 11, 2021); *see also, e.g.*, *Castellanos v. Sec'y of Health & Human Servs.*, No. 19-1710V, 2022 WL 1482497, at *10 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (emphasizing recognition of "the seriousness of GBS as a general matter," in awarding a six-figure sum); *Voeller v. Sec'y of Health & Human Servs.*, No. 20-1526V, 2023 WL 5019830, at *10 (Fed. Cl. Spec. Mstr. July 6, 2023) (noting GBS's "frightening" nature).

But of course, not every GBS case is equally severe. Further details of the initial medical course are considered – including any mistake or delay in diagnosing GBS; any in-patient hospitalization and/or in-patient rehabilitation (and the duration of any such stays); diagnostic procedures (e.g., bloodwork, lumbar punctures, electrodiagnostic studies, imaging); the severity of symptoms at their nadir (e.g., involving incontinence or respiratory failure); the extent and effectiveness of treatment (e.g., IVIg, plasmapheresis, pain medications); other interventions (e.g., feeding tubes, breathing tubes, catheterization); and any complications (e.g., sepsis during hospitalization).

Also relevant is the long-term course – as evidenced by out-patient therapies, neurology evaluations, and other medical appointments concerning GBS; the results of

---

[9] *See also National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table – Notice of Proposed Rulemaking*, 80 Fed. Reg. 45132, at 45144 – 45 (July 29, 2015) (proposing addition of Table flu/GBS claims – explaining GBS is "an acute paralysis caused by dysfunction in the peripheral nervous system [that…] may manifest with weakness, abnormal sensations, and/or abnormality in the autonomic (involuntary) nervous system," and that death, when it occurs, is most often related to respiratory failure).

[10] Shoulder injury related to vaccine administration ("SIRVA") is another Table injury. 42 C.F.R. §§ 100.3(a), (c)(10).

repeat electrodiagnostic studies and other relevant tests; medical providers' assessments of the degree of recovery achieved; ongoing reliance on assistive devices and medications; and relevant treatment gaps. Previous opinions have recognized that "a substantial recovery does not mean that [an individual] has fully recovered from his GBS and has no ongoing sequelae. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." *Elenteny v. Sec'y of Health & Human Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec. Mstr. Mar. 10, 2023). But symptoms of that nature are typically folded into a "typical" past pain and suffering award, and will not justify a future component. *See, e.g., id.*; *Miller v. Sec'y of Health & Human Servs.*, No. 21-1559V, 2023 WL 2474322, at *8 (Fed. Cl. Spec. Mstr. Feb. 10, 2023).

"The mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life – especially one as alarming and potentially life-altering as GBS – and therefore is not alone reason for a lower award." *Bircheat v. Sec'y of Health & Human Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021). However, a special master is statutorily required to consider to what extent a petitioner's pain and suffering is truly "*from* the vaccine-related injury," Section 15(a)(4) (emphasis added), and not from any unrelated preexisting or subsequently-developed medical issues. *See, e.g.*, *Bircheat*, 2021 WL 3026880, at *4; *Gross*, 2021 WL 2666685, at *5.

Also worthy of consideration are the injury's impact on a petitioner's personal circumstances including his or her family and other personal obligations, and professional life (whether or not lost wages are directly claimed).

All of these facts are primarily gleaned from the medical records – although sworn statements and/or other evidence may also be considered, especially if they *supplement*, and do not contradict, the facts reflected in the medical records.

### III.    Relevant Medical History

Petitioner was 50 years old when he received the flu vaccine on December 11, 2019 at WellSpan Health. Ex. 1 at 1. Twelve days later (December 23rd), he went to the emergency department ("ED") for bilateral leg weakness that had resulted in him falling twice. Ex. 2 at 58. On examination, he had diminished patellar reflexes. *Id.* at 62. Dr. Chiemeke Nwabueze noted concern for GBS, and Petitioner was admitted to the intensive care unit ("ICU"). *Id.* at 58.

The same day, Petitioner was evaluated by neurologist Dr. Anthony Torres. Ex. 2 at 31. Petitioner exhibited decreased motor strength bilaterally in his lower and upper extremities, an absence of reflexes bilaterally in his lower extremities, decreased reflexes in his upper extremities, and decreased sensation. *Id.* at 35. He underwent a lumbar

puncture which showed a slightly elevated protein level. *Id.* at 69, 183. Following the lumbar puncture, he had a cerebrospinal fluid leak with migraine headache, which was treated with a blood patch. Ex. 4 at 17. Dr. Torres ordered a five day course of IVIG and prescribed gabapentin. Ex. 2 at 31.

By December 25, 2019, Petitioner was no longer in the ICU. Ex. 2 at 88. He had improved muscle strength in upper and lower extremities, and his pain had improved significantly with one dose of Toradol. *Id.* On January 3, 2020, Petitioner was transferred to an inpatient rehabilitation facility for physical therapy, occupational therapy, rehabilitative nursing, psychology, and case management support, with a diagnosis of GBS. Ex. 4 at 754. He was expected to stay there for seven days. *Id.*

Four days later, however (January 7, 2020), Petitioner's GBS symptoms worsened, and he was taken by ambulance back to the hospital. Ex. 4 at 752-53; Ex, 5 at 57. On January 8, 2020, he saw neurologist Dr Robert Sterling, who noted that the recurrence of symptoms was unexpected for "standard" GBS, and ordered additional lab work. Ex. 5 at 78. Petitioner reported a pain level of seven out of ten, which was treated with prescription medications. *Id.* at 147-48. An EMG performed that day "suggest[ed] the presence of a sensorimotor peripheral neuropathy, with some suggestion of demyelinating features." *Id.* at 183. Dr. Sterling viewed the EMG as inconclusive, and recommended a second five-day course of IVIG. *Id.* at 133.

Following completion of IVIG, Petitioner was transferred back to inpatient rehabilitation in mid-January 2020. Ex. 5 at 59, 240. He continued to have numbness, tingling, and burning sensations in his arms and legs, though it had improved since his second course of IVIG. Ex. 4 at 21. He now exhibited normal strength except for 4 to 4+/5 distal lower extremity weakness. *Id.* at 25.

Petitioner remained in inpatient rehabilitation from January 15-23, 2020. Ex. 4 at 14. An occupational therapy assessment on January 16th revealed deficits in activities of daily living, balance, fine motor control, functional mobility, range of motion, trunk control, gross motor control, strength, and endurance. *Id.* at 42. At discharge, he could shower, but needed a cane and precautions to avoid falls. *Id.* at 16, 19. He was not cleared to drive. *Id.* at 19.

Petitioner followed up with his primary care physician, Dr. Diane Kepner, on January 29, 2020 complaining of weakness, numbness, and issues with proprioception. Ex. 3 at 11. On examination, he had normal motor strength in upper and lower extremities, but still walked with a shuffling gait. *Id.* at 12. He was scheduled to begin outpatient physical therapy ("PT"). *Id.* at 11-12.

On February 4, 2020, Petitioner underwent a PT evaluation for GBS, impaired mobility and activities of daily living, ambulatory dysfunction, bilateral leg weakness, gait disturbance, and physical deconditioning. Ex. 6 at 30. He was assessed with signs and symptoms consistent with deconditioning and muscle weakness from GBS. *Id.* at 32. He

was unable to work due to his symptoms, which included hand and foot numbness, weakness, and decreased endurance. *Id*. He rated his pain three out of ten. *Id*. at 34. His treatment plan was two sessions a week. *Id*. at 32.

Petitioner attended a second PT session on February 11, 2020. Ex. 6 at 16. He was noted to be highly motivated, but experienced shortness of breath and fatigue, needing rest breaks. *Id*. He continued to report pain of three out of ten. *Id*. He did not attend any further PT sessions, and following multiple cancellations, he was formally discharged from PT. *Id*. at 12. On March 30, 2020, Petitioner returned to Dr. Kepner for an annual physical examination. Ex. 3 at 4. Dr. Kepner noted that "from [a] gbs standpoint, [Petitioner] is back to normal." *Id*. He did not report dizziness, numbness, or difficulty walking, or other neurological symptoms, and no neurological examination was documented. *Id*. at 5.

Almost a year later, on March 11, 2021, Petitioner was seen by podiatrist David Baskwill for bilateral foot pain and difficulty walking after sitting for periods of time. Ex. 7 at 5. On examination, he had dyesthesia, hyperesthesia, and paresthesia in his distal extremities. *Id*. at 7. He was assessed with idiopathic peripheral neuropathy and casted for orthotics. *Id*.

Two years after that (April 3, 2023), Petitioner saw neurologist Dr. Albert Heck complaining of persistent numbness in his toes. Ex. 11 at 3. Petitioner explained that the sensation in his toes "never came back" after his GBS. *Id*. During Petitioner's 2019-20 hospitalization, Dr. Sterling had suggested that Mr. Piermatteo follow up for tertiary care, but "apparently that did not happen." *Id*. On examination, Petitioner had trace to absent reflexes. *Id*. at 7. Dr. Heck noted that GBS is "[u]sually a monophasic illness, [but] there are patients who have recurrent episodes . . . . It is not unusual for patients to sometimes have residual sensory symptoms associated with recovery from Guillain-Barré." *Id*. at 3. A repeat EMG was ordered. *Id*. Petitioner's June 21, 2023 EMG suggested the presence of a mild peripheral neuropathy. Ex. 12 at 5. No further medical records have been filed.

### IV.    Declaration[11]

Petitioner explains that in order to start a new job with WellSpan, a healthcare provider, he was required to receive a flu vaccine. Ex. 9 at ¶ 1. Twelve days after vaccination, he went to the ED with numbness in his legs and arms. *Id*. He needed a lumbar puncture before he could receive IVIG, and it "took several attempts before a puncture was accurately made." *Id*. When the GBS diagnosis was confirmed, he was admitted to the ICU and IVIG was started. *Id*. For the next three days, he suffered a migraine from the lumbar puncture, and thus spent those days in darkness. *Id*. He

---

[11] Although Petitioner labeled Exhibit 9 as an affidavit, it is not notarized. Nonetheless, it is acceptable as a declaration because it complies with the requirements of 28 U.S.C. §1746.

received an epidural blood patch – which took two painful attempts – to relieve the pain from the migraine. *Id.* He was given morphine because the nerve pain was "unbearable." *Id.*

After completing the first round of IVIG, Petitioner was transferred to an inpatient rehabilitation hospital. Ex. 9 at ¶ 2. At the time, he still lacked strength in his legs and arms. *Id.* After several days there, the numbness in his arms and legs returned and he was sent back to the hospital for another round of IVIG. *Id.* Once he completed the second round of IVIG, he returned to the inpatient rehabilitation facility. *Id.*

When Petitioner was discharged home from inpatient rehabilitation, he was still taking morphine for nerve pain. Ex. 9 at ¶ 3. He could walk with a cane, and still did not have sensation in his feet and legs, and his arms and hands were weak. *Id.* at ¶ 2. He started outpatient rehabilitation, and once his arms and legs were strong enough he stopped going to formal rehabilitation appointments and did his exercises on his own at home. *Id.* at ¶ 3.

Petitioner states that he was unable to begin his new job and pay his bills due to his GBS. Ex. 9 at ¶ 4. If not for the kindness of friends, he "would have lost [his] home." *Id.* He was "far too weak" to work, and fell at home a few times, though without serious injury. *Id.* He accidentally burned his hands a few times because he could not feel how hot dish water was. *Id.* After this, he weaned himself off of morphine. *Id.*

Petitioner was told that the feeling may or may not return in his feet and toes. Ex. 9 at ¶ 5. He experienced severe foot pain. *Id.* After suffering "for several months," he went to a podiatrist – who said there was nothing they could do, suggesting only leg, calf, and foot stretches, which he did. *Id.*

As of April 2022, when he signed his declaration, Petitioner continued to "live with terrible pain in [his] feet." Ex. 9 at ¶ 6. His toes were numb, and his balance was "nowhere near what it was before December, 2019." *Id.* He had to be careful going down stairs because he could not fully feel when his foot hit the step. *Id.* He could no longer play volleyball and golf at the level he could before his GBS due to his balance deficits. *Id.*

## V.    The Parties' Arguments

Petitioner requests an award of $185,000.00 in past pain and suffering. Petitioner's Damages Brief, filed July 1, 2024, at *6 ("Br."). Petitioner asserts that he experienced a severe and continuous injury that precipitated an extended course of treatment that has never fully restored him to his pre-vaccination state of health. Br. at *8. He argues that within two weeks of vaccination, he suffered two falls due to bilateral weakness in his thighs. *Id.*

Petitioner was hospitalized (including inpatient rehabilitation) for 30 days beginning just 12 days after vaccination, underwent two rounds of five-day IVIG treatments, a

lumbar puncture, and intensive physical and occupational therapy. Br. at *8-9. He was "shuttled back and forth repeatedly" between the hospital and inpatient rehabilitation center. *Id.* at *9. Following his hospitalization, he continued to have bilateral leg weakness, ambulatory dysfunction, gait disturbance, physical deconditioning, and deficits in his ability to perform activities of daily living. *Id.* Petitioner asserts that he was "unable to work for five months," although the record cited to support this allegation is from February 4, 2020 (Ex. 6 at 32), and thus does not appear to support an inability to work much beyond about six weeks. *Id.* He continued to have foot pain long after his hospitalization. *Id.* at *9-10.

Petitioner received the flu vaccine at issue in this case because it was required to begin a new job. Br. at *10. Due to his illness, however, he was unable to do the work needed for the job, resulting in "financial hardship, [inability] to pay his bills, and [the need] to rely on the kindness of friends to prevent him from losing his home." *Id.* Petitioner's 2023 neurology follow up demonstrated continued sensory disturbances and diminished reflexes. *Id.* Petitioner has not continued treatment for his GBS "only because his doctor informed him that, at this stage, there is no further treatment that can be offered to him." *Id.* at *11.

Petitioner cites *McCray*, *Johnson*, and *Fedewa* – all with pain and suffering awards of $180,000.00 – in support of his requested pain and suffering award.[12] Br. at *11-13. Petitioner asserts that his injury is similar to that of the *McCray* petitioner, in that both suffered numbness, balance problems, and an unsteady gait, and both underwent hospitalization and rehabilitation therapy. *Id.* at *11-12. However, Petitioner was hospitalized longer than the *McCray* petitioner – suggesting a more serious injury, and thus justifying a greater award. *Id.*

Similarly, Petitioner argues that the *Johnson* petitioner was hospitalized for five days and underwent a five-day course of IVIG, while he was hospitalized for a total of 30 days (including inpatient rehabilitation) and underwent two five-day IVIG treatments. Br. at *12. Both petitioners were unable to work for a period of time and suffered lasting effects, although Mr. Piermatteo asserts that his injury has continued for longer. *Id.* And the *Fedewa* petitioner was able to return to work after only three months, with lifting restrictions, and reported no numbness or weakness after a year and a half. *Id.* at *13.

Respondent asserts that the medical records demonstrate a less severe course of GBS, comparatively speaking. Respondent's Damages Brief, filed Sept. 6, 2024, at *8 (ECF No. 38) ("Resp."). While some GBS patients require extensive and lengthy hospitalizations, Mr. Piermatteo was in the hospital for 15 non-consecutive days, and his

---

[12] *McCray v. Sec'y of Health & Human Servs.*, No. 19-0277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021); *Johnson v. Sec'y of Health & Human Servs.*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018); *Fedewa v. Sec'y of Health & Human Servs.*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. Mar. 26, 2020).

inpatient rehabilitation also occurred over 15 non-consecutive days. Resp. at *8-9. Petitioner underwent two five-day courses of IVIG, took prescription medications, and attended only two outpatient PT sessions. *Id.* at *9. Most of his treatment occurred during the immediate two months after his GBS diagnosis and hospitalization. *Id.* Importantly, in March 2020, Petitioner's primary care physician stated that "from [a] gbs standpoint, [petitioner] [wa]s back to normal." *Id.* at *9 (citing Ex. 3 at 4).

Petitioner then did not seek any medical care for a year, at which point he sought care for "foot issues that seemed to predate his GBS." Resp. at *9. Not until another two years later – April 2023 – did Petitioner return to a neurologist to evaluate toe numbness that he related to his GBS diagnosis. *Id.* His EMG showed a mild, but improved, peripheral neuropathy, and he did not receive GBS-specific treatment. *Id.* at *9-10.

Respondent argues that Petitioner's case was less severe than any of the cases he cites. Resp. at *10. For example, the *McCray* petitioner suffered more lasting sequela, such as new onset asthma and pain still treated with medication years after her diagnosis, was unable to return to her part-time job, and walked with a cane. *Id.* Although Petitioner alleged temporary inability to work, he has not substantiated this claim. *Id.* The *Johnson* petitioner was unable to drive or work "for a considerable length of time," and experienced ongoing numbness/tingling, decreased sensation, fatigue, and urinary issues. Resp. at *10. And the *Fedewa* petitioner had complications relating to his lumbar puncture and his diagnosis "interfered with his ability to work for months." *Id.* at *10-11. Due to these differences, Respondent proposes a pain and suffering award of $120,000.00 – although he does not cite any reasoned decisions in support of this sum. *Id.* at *11.

Petitioner takes issue with Respondent's characterization of his hospitalization as "relatively short," asserting that 30 days – a full month – is "anything but an inconsequential period of time to be hospitalized, especially when compared to other Vaccine Program GBS cases." Petitioner's Reply, filed Sept. 20, 2024, at *2 (ECF No. 39) ("Reply"). He notes that he spent "a large portion of that time" in the ICU. Reply at *2. After 11 days of in the hospital, he was transferred to inpatient rehabilitation. *Id.* However, after only four days there, his condition worsened and he was returned to the hospital by ambulance. *Id.*

Petitioner asserts that he "suffered grievously for several days in hospital," followed by ongoing sequela and recurrent symptoms. Reply at *2. Petitioner acknowledges that the *Fedewa* petitioner underwent two lumbar punctures – but asserts that Mr. Fedewa was only hospitalized for 14 days. *Id.* at *4. Petitioner acknowledges that no two cases are exactly the same, but in his view the cases he cites "are truly comparable cases." *Id.* at *3-4.

## VI.    Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including the medical records, declaration, and all assertions made by the parties in written documents and at the hearing. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

As I said during the hearing, Respondent has not adequately defended his proposed award with comparable cases. As a result, I rely on Petitioner's comparables – which I consider to be fairly good guideposts herein – as a starting point.

In this case, Petitioner underwent intense treatment during the acute phase, including time spent in the ICU. Although I acknowledge that inpatient rehabilitation treatment is not the same as hospitalization, it is meaningful that Petitioner had two rehabilitation stays totaling 11 days in addition to 19 days of hospitalization. However, his overall course of treatment was not particularly long, and he had few lingering effects by the six month mark. Although he had some later treatment, it was not significant.

Petitioner had a somewhat unusual course of illness, in that he improved enough to go to a rehabilitation facility, then worsened and was sent back to the hospital for a second round of IVIG before returning to rehabilitation. He suffered a complication of his lumbar puncture that caused migraine, exacerbating his suffering. However, his assertion that he was unable to work for five months is not well substantiated.

I agree with Petitioner that *McCray* is particularly similar. Mr. Piermatteo and the *McCray* petitioner were hospitalized for similar amounts of time, and underwent comparable treatment while hospitalized. However, the *McCray* petitioner had greater impairments and required more treatment in the months after being discharged, needing a walker and home-based therapies, and suffered anxiety and panic attacks. In light of the *McCray* petitioner's more significant residual effects, I find Mr. Piermatteo's award should be somewhat lower.

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $170,000.00 represents a fair and appropriate amount of**

compensation for Petitioner's actual pain and suffering.[13] **I also find that Petitioner is entitled to $54,917.29 to satisfy a Medicaid lien.**

Based on the record as a whole and arguments of the parties, **I award Petitioner the following:**

- **A lump sum payment of $170,000.00 to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner; and**

- **A lump sum payment of $54,917.29, representing compensation for satisfaction of a Pennsylvania Medicaid lien, in the form of a check payable jointly to Petitioner and:**

  **Department of Human Services – CIS (Reference)#: 464225037**
  **Bureau of Program Integrity/Division of Third Party Liability – Recovery Section**
  **P.O. Box 8486**
  **Harrisburg, PA 17105-8486**

Petitioner agrees to endorse the check to the above payee for satisfaction of the Medicaid lien.

These amounts represent compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[14]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[13] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.